UNITED STATES DISTRICT COURT<br>
NORTHERN DISTRICT OF ALABAMA<br>
NORTHWESTERN DIVISION

FILED

02 APR -5 PM 2:04

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| JOHN LANE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-02-S-380-NW |
| | ) | |
| GOLD KIST, INC., AND | ) | |
| AGRATRADE FINANCING, INC., | ) | |
| | ) | ENTERED |
| Defendants. | ) | |

PR  5 2002

**MEMORANDUM OPINION**

Plaintiff, John Lane, instituted this action in the Circuit Court of Franklin County, Alabama, on January 9, 2002. His complaint contains six counts, and asserts claims of breach of contract and wrongful foreclosure against both defendants, Gold Kist, Inc. ("Gold Kist") and AgraTrade Financing, Inc. ("AgraTrade"), and breach of warranty, negligence, and intentional interference with plaintiff's contractual obligations against Gold Kist. All claims grow out of plaintiff's allegation that, during April of 1998, when plaintiff still was self-employed as a poultry producer, Gold Kist delivered to him a diseased flock of chickens. Plaintiff claims that the diseased flock resulted in lower production and reduced profits for his poultry operation. He further claims that Gold Kist refused to supply him with any more flocks after 1998, but continued to demand loan payments through its subsidiary, AgraTrade, which had financed plaintiff's poultry operations. AgraTrade ultimately foreclosed on the collateral securing plaintiff's loans.

Defendants removed plaintiff's action to this court on February 13, 2002, alleging that the suit could have been originally filed in federal court, based upon the parties' complete diversity of citizenship and the requisite amount in controversy. *See* 28 U.S.C. §§ 1332(a)(1), 1441(a), 1446.



The action is before the court on defendants' motion to compel arbitration and to stay these proceedings during the interim.

## I. FACTUAL BACKGROUND

Defendants describe Gold Kist as "an agricultural co-operative owned by its farmer members and run for their benefit by a Board of Directors elected by them."[1]  The Annual Report for fiscal year 1998 that was filed with the Securities and Exchange Commission described Gold Kist as

> a diversified agricultural membership cooperative association, headquartered in Atlanta, Georgia. ... Each member is issued one share of common stock only, as evidence of membership and the right to one vote as long as the member maintains status as an active member.  Only members may hold the common stock, which is nontransferable and receives no dividends.
>
> Gold Kist *serves* approximately 31,000 active *farmer* members located principally in Alabama, Florida, Georgia, Mississippi, South Carolina, and Texas. In addition, other cooperative associations are members of Gold Kist.  Any person engaged in the production of farm commodities and any firm or corporation *whose members* or *stockholders* are persons so engaged and any cooperative association organized under the cooperative marketing laws of any state, which enters into a marketing and/or purchasing agreement with the Association, is eligible for membership.
>
> Gold Kist offers both cooperative marketing and cooperative purchasing services to its member patrons.  Farm commodities are marketed by Gold Kist on behalf of *members*.  Similarly, Gold Kist manufactures or processes many products purchased for its members.  The standard Membership, Marketing, and/or Purchasing Agreement which is entered into between each member and Gold Kist does not require the member to market his agricultural products or to purchase farm supplies through Gold Kist.  Under the agreement, Gold Kist undertakes to market *for the member* agricultural products delivered which are of a type marketed by Gold Kist and to purchase or manufacture and sell to the member such farm supplies as the member requires, provided it is advantageous for Gold Kist to handle such supplies in the interest of the membership.  The Association also does business with non-members and engages in non-cooperative activities through subsidiaries and partnerships.  AgraTrade Financing, Inc., a wholly-owned subsidiary of Gold Kist, provides financing to members and non-members doing business with Gold Kist and its subsidiaries and partnerships.  Financing is extended for poultry and pork housing

---

[1] Defendants' Motion to Compel Arbitration and Motion for Stay (doc. no. 2) ¶ 1.

construction and for certain farm commodity crop production.[2]

AgraTrade is Gold Kist's "wholly-owned finance subsidiary,"[3] which "provides financing to Gold Kist's member farmers, such a[s] Plaintiff Lane,"[4] who obtained financing for his poultry operation through that entity during 1990. Plaintiff executed a promissory note, security agreement, and mortgage in connection with that transaction. None of those documents contained an arbitration clause.

During September of 1990, plaintiff entered into a "membership, marketing, and/or purchasing agreement" with Gold Kist. By signing the agreement, plaintiff applied for membership in Gold Kist's cooperative marketing association, and Gold Kist agreed to market plaintiff's agricultural products. The agreement did not contain an arbitration clause.

Plaintiff executed a Servicing Agreement for a "hatching egg flock" with Golden Poultry Company, Inc., during December of 1990. By the terms of that agreement, Golden Poultry promised to provide plaintiff with chicks, feed, vaccines, medicines, and other supplies, and plaintiff agreed to care for the flock and collect the eggs until the end of the "profitable egg laying period," when Golden Poultry removed the flock. Plaintiff was paid a specified amount per chick for growing the flock to healthy production size, and was also paid a specified amount based on egg production.[5] The agreement did not contain an arbitration clause.

At Gold Kist's annual meeting held during October of 1993, its members authorized, and its Board of Directors implemented, an arbitration policy which took effect on January 1, 1994. That

---

[2]Plaintiff's Response in Opposition to Defendants' Motion to Compel Arbitration (doc. no. 4), Exhibit 5 (Form 10-k, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934), at 3 – 4 (*emphasis* in original).

[3]*Id.* at 4, 7

[4]Defendants' Motion to Compel Arbitration and Motion for Stay (doc. no. 2) ¶ 1.

[5]Plaintiff's Response in Opposition to Defendants' Motion to Compel Arbitration (doc. no. 4), Exhibit 4.

policy provided:

> All disputes of fact or law between Gold Kist and members arising during the period of a member's membership, even if resolution of the dispute is attempted after termination of the member's membership, and even if the facts or events alleged in the dispute arose or existed prior to the disputing party's becoming a member. This arbitration policy is intended to cover all types of disputes to the maximum extent permissible by the law in effect at the time a dispute arises, whether the dispute arises under federal or state statutes or common law, except that this arbitration policy shall not include, nor shall it permit any arbitrator to decide, disputes relating to matters in the discretion of management or the Board of Directors, nor patronage or corporate power or governance matters since they could involve questions affecting the membership as a whole. Neither shall it apply to any purchases or sales between Gold Kist and members, or contracts for such purchases or sales, if the transactions were completed or the contracts executed prior to the effective date of this policy.[6]

The policy contains the following provision relating to third parties:

> It is the intent of the Board that, to the fullest extent allowed by law, this policy to submit disputes to binding arbitration is binding on and inures to the benefit of the parties' respective directors, officers, employees, agents, servants, successors, assigns, and all other persons in privity or in active concert and participation with them whose acts bear on the underlying dispute. All such persons shall be deemed third-party beneficiaries of this policy, with full rights to enforce all provisions of this policy in any manner allowed by law. Notwithstanding the foregoing, it being the purpose of this policy to resolve all disputes in an expeditious and inexpensive manner, any party may in its sole discretion elect to rescind its obligation to arbitrate if (i) the reasonably likely result of instituting the arbitration would be that all parties who could be joined in the proceeding if the Federal Rules of Civil Procedure were applicable thereto may not be compelled to arbitrate and (ii) the rescinding party, whether a party who instituted the arbitration or a party defending the arbitration, elects to file a separate suit in court against one or more persons not bound by this arbitration policy. However, the obligation to arbitrate shall survive or be reinstated and judicial proceedings shall be suspended during the arbitration, if all parties not otherwise bound by this arbitration policy consent to participate in a single or consolidated binding arbitration proceeding.[7]

The rationale for adopting the policy was described as follows:

> This policy was adopted and arose out of the cooperative concept. In a cooperative,

---

[6]Defendants' Reply to Plaintiff's Response in Opposition to Defendants' Motion to Compel Arbitration and for Stay (doc. no. 6), Exhibit 1B, at 1.

[7]*Id.*

all of the farmer members are working together toward a common goal. The cooperative is owned by the farmer members themselves, and there are no "outside" equity investors. In this context, the membership and the Board thought that it was most appropriate that all disputes between the cooperative and its members be settled as quickly and fairly as possible within the cooperative itself, and without resorting to the court system. In addition, damages for disputed items are limited to those which would compensate the injured party for its actual loss, rather than permit the courts and juries to award arbitrary punitive damages. If punitive damages are awarded against the cooperative, only the other members suffer. Neither can the cooperative recover punitive damages against the member.[8]

Plaintiff and Gold Kist entered into the "membership, marketing, and/or purchasing agreement" that is the basis for defendants' motion to compel arbitration on September 8, 1997, subsequent to the adoption of the foregoing arbitration policy.

On the same date that plaintiff and Gold Kist executed the foregoing agreement, September 8, 1997, Golden Poultry Company, Inc., was a 75% majority-owned public subsidiary of Gold Kist.[9] Gold Kist acquired the remaining interest in Golden Poultry later that same month. Following Gold Kist's acquisition of the remaining interest in Golden Poultry, the company thereafter was operated as a cooperative broiler division of Gold Kist.[10]

The "membership, marketing, and/or purchasing agreement" executed by plaintiff and Gold Kist on September 8, 1997 contains a provision providing that "[t]he person whose signature appears below acknowledges that the full text of the MEMBERSHIP, MARKETING, AND/OR PURCHASING AGREEMENT of GOLD KIST, INC., ATLANTA, GEORGIA, appears on the reverse side of this agreement and is incorporated herein."[11] Plaintiff's signature appears on the line designated "Member's ('Producer's') Signature." One of the provisions appearing on the reverse

---

[8]*Id.*, Exhibit 3, at 1.

[9]*See, e.g.*, note 2 *supra*, at 5.

[10]*Id.*

[11]Defendants' Motion to Compel Arbitration and Motion for Stay (doc. no. 2), Exhibit A.

of the agreement was an arbitration clause, reading as follows:

> 9.   Gold Kist and Producer will submit to binding arbitration all disputes between the parties, whether governed by federal, state or international contract law, tort law, statute, or treaty, and irrespective of the form of relief sought, relating to or arising out of matters of a type declared by Gold Kist's Board of Directors before the dispute arises to be of a type covered by Gold Kist's arbitration policy.  This obligation to arbitrate shall survive any termination of membership with respect to matters arising or relating to events or actions before such termination.  All such arbitrations shall be according to rules and procedures adopted from time to time by Gold Kist's Board of Directors.

> In no event will punitive or exemplary damages be claimed by or awarded to either party, in arbitration or otherwise.[12]

The record also contains a document signed by plaintiff and Gold Kist, designated as "Exhibit A," referencing "the Servicing Agreement (Hatching Egg Flock) between Gold Kist, Inc. and John Lane 3409 dated April 23, 1998," and setting forth the applicable payment rates.  The Servicing Agreement itself does not appear in the record.

## II. DISCUSSION

Defendants request this court to compel arbitration of plaintiff's claims against both Gold Kist and AgraTrade, based on the arbitration clause in the "membership, marketing, and/or purchasing agreement" executed by plaintiff on September 8, 1997 ("Membership Agreement").

Plaintiff contends that his claims are not subject to arbitration because:  plaintiff and AgraTrade did not agree to arbitrate any disputes; there was no arbitration clause in the 1990 Servicing Agreement between plaintiff and Golden Poultry; plaintiff's claims are not within the scope of the arbitration clause contained in the 1997 Membership Agreement; there is no evidence that Gold Kist's Board of Directors declared claims such as plaintiff's to be subject to the arbitration policy; the arbitration clause contravenes public policy by precluding the recovery of punitive

---

[12]*Id.* (reverse side).

damages; plaintiff will be left without a forum to resolve the dispute because he cannot pay the costs

of arbitration; and, there is not a sufficient connection with interstate commerce.

The threshold issue confronting this court is that of determining whether the arbitration

clause found in the 1997 Membership Agreement covers the claims raised by plaintiff against both

defendants.

> The Federal Arbitration Act governs the question of who must decide issues of
> arbitrability. Under the Act, a district court must compel arbitration if the parties
> have agreed to arbitrate their dispute. 9 U.S.C. §§ 2, 3 (1988). However, if the
> validity of the agreement to arbitrate is at issue, a district court, not a panel of
> arbitrators, must decide if the arbitration clause is enforceable against the parties. *Id.*
> § 4; *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-04,
> 87 S. Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967) (holding that if the making of the
> arbitration agreement is an issue "the federal court may proceed to adjudicate it").
> Simply put, parties cannot be forced to submit to arbitration if they have not agreed
> to do so. *Volt Info. Sciences, Inc. v. Board of Trustees,* 489 U.S. 468, 478, 109 S. Ct.
> 1248, 1255, 103 L.Ed.2d 488 (1989); *Goldberg v. Bear, Stearns & Co.,* 912 F.2d
> 1418, 1419 (11th Cir. 1990) (per curiam). Thus, "the first task of a court asked to
> compel arbitration of a dispute is to determine whether the parties agreed to arbitrate
> that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S.
> 614, 626, 105 S. Ct. 3346, 3353, 87 L.Ed.2d 444 (1985).

*Chastain v. Robinson-Humphrey Company, Inc.,* 957 F.2d 851, 853-54 (11th Cir. 1992). The

Supreme Court also has instructed that

> questions of arbitrability must be addressed with a healthy regard for the federal
> policy favoring arbitration.... The Arbitration Act establishes that, as a matter of
> federal law, any doubts concerning the scope of arbitrable issues should be resolved
> in favor of arbitration, whether the problem at hand is the construction of the contract
> language itself or an allegation of waiver, delay or a like defense to arbitrability.

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24-25, 103 S.Ct.

927, 941-42, 74 L.Ed.2d 765 (1983). "Thus, as with any other contract, the parties' intentions

control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi*

*Motors Corporation v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353-54,

87 L.Ed.2d 444 (1985).

Plaintiff's relationship with Gold Kist has three aspects. The first is their relationship based on the financing provided by Gold Kist's wholly-owned subsidiary, AgraTrade. AgraTrade's services are not part of Gold Kist's cooperative activities.[13] The second aspect of their relationship is Gold Kist's supply of hatching egg flocks to plaintiff through its (now) wholly-owned cooperative broiler division, Golden Poultry, and the terms of payment based on plaintiff's production, as memorialized in "Servicing Agreements." The third aspect of their relationship is the agreement for Gold Kist to market agricultural products produced by members of the cooperative, such as plaintiff, and for Gold Kist to purchase and offer for sale to its members "machinery, equipment, fertilizer, feeds, seeds and other supplies."[14]

## A.    Applicability of the Federal Arbitration Act

Plaintiff argues that the arbitration clause contained on the reverse side of his 1997 Membership Agreement does not apply to his claims, because those claims do not implicate interstate commerce and, accordingly, the Federal Arbitration Act does not apply. Specifically, plaintiff contends:

> John Lane is a grower. He raises and cares for a flock of chickens in Franklin County, Alabama supplied to him from Gold Kist from its Russellville[, Alabama] plant. All the activity takes place within Franklin County, Alabama, and while there are ripple effects after the fact as to where these chickens go, such is outside the scope of the parties' agreement since John Lane has neither any control over Gold Kist activity once they have removed the chickens at 60 to 65 weeks of age. The defendants have not demonstrated that this service agreement has a substantial affect [sic] on interstate commerce.[15]

---

[13]*See* Plaintiff's Response in Opposition to Defendants' Motion to Compel Arbitration (doc. no. 4), Exhibit 5 (Form 10-k, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934), at 4.

[14]Defendants' Motion to Compel Arbitration and Motion for Stay (doc. no. 2), Exhibit A.

[15]Plaintiff's Response in Opposition to Defendants' Motion to Compel Arbitration (doc. no. 4), at 14.

Section 2 of the Federal Arbitration Act "makes 'valid, irrevocable, and enforceable' only two types of contracts: those relating to a maritime transaction and those involving commerce." *Bernhardt v. Polygraphic Company of America, Inc.,* 350 U.S. 198, 200, 76 S. Ct. 273, 275, 100 L.Ed.2d 199 (1956). The Supreme Court directs district courts to accord an expansive construction to the phrase "involving commerce." *See Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 268, 115 S. Ct. 834, 836, 130 L.Ed.2d 753 (1995). Additionally, the Court has construed the phrase "involving commerce" as being the functional equivalent of "affecting commerce": a phrase that "normally signals Congress' intent to exercise its Commerce Clause powers to the full." *Id.* at 273, 115 S. Ct. at 839; *see also Paladino v. Avnet Computer Technologies, Inc.*, 134 F.3d 1054, 1060 (11th Cir. 1998) (Cox and Tjoflat, JJ., concurring) (noting that "[t]he FAA's provisions concerning the validity of arbitration clauses reach to the edge of Congress's power under the Commerce Clause").

Defendants dispute the assertion that the contract between plaintiff and Gold Kist did not evidence a transaction affecting interstate commerce. As support for their position, they offer the affidavit of Don W. Mabe, Jr., Gold Kist's Vice President of Operations, stating that the transactions between Gold Kist and plaintiff "involved interstate commerce" because:

a.    Gold Kist's principal place of business is in Atlanta, Georgia.

b.    In accordance with the Membership Agreement, Gold Kist furnished John Lane with flocks of chickens, feed, vaccines, and medicines in order to facilitate egg laying and broiler production.

c.    The feed, vaccines, and medicines were shipped to Lane from Gold Kist's facilities in Russellville and Tuscumbia, Alabama. Certain of the ingredients for the feed are received by the Tuscumbia feed mill by barge from the Midwest.

d.    The mature eggs and broilers were returned to the Russellville, Alabama Plant for processing, packing, and direct marketing to distributors, grocery stores, and food chains throughout North America as well as to customers in Russia and China.

e.    It was in the contemplation of the parties that the eggs and broilers, after reaching maturity, would [be] marketed  and distributed in interstate commerce.[16]

Based on the foregoing, the court finds that the 1997 Membership Agreement between plaintiff and Gold Kist pertained to transactions that substantially affected interstate (as well as foreign) commerce, in that plaintiff indisputably was "producing goods for commerce." *See Bernhardt*, 350 U.S. at 201, 76 S. Ct. at 275. In short, the Federal Arbitration Act applies.

**B.    Scope of the Arbitration Clause**

Plaintiff next argues that the arbitration clause does not encompass his claims, because those claims grew out of the delivery of an allegedly diseased flock of chickens to plaintiff by Gold Kist's (now) wholly-owned cooperative broiler division, Golden Poultry, and AgraTrade's subsequent foreclosure of collateral. Neither event, plaintiff asserts, relates to his 1997 Membership Agreement with Gold Kist, in which the arbitration clause appears, for the marketing of products produced by plaintiff.

At first blush, plaintiff's argument has a surface appeal. But the beauty of it is only skin deep. The arbitration clause contained in the Membership Agreement, governing the marketing of agricultural products produced by members of the Gold Kist cooperative, unquestionably is broad. The Eleventh Circuit has previously considered the scope of Gold Kist's arbitration *policy*,[17] finding that it "unambiguously stat[es] that it encompasses <u>all</u> disputes of fact or law" between Gold Kist

---

[16]Defendant's Reply to Plaintiff's Response in Opposition to Defendants' Motion to Compel Arbitration and for Stay (doc. no. 6), Exhibit 1, ¶ 7.

[17]*See* text accompanying notes 6-8 *supra*.

and member-producers. *Beatty v. Gold Kist, Inc.*, No. 00-11439 (11th Cir. Jan. 8, 2001).[18] While plaintiff insists that his claims against Gold Kist pertain only to the hatching egg flock supply aspect of his relationship with Gold Kist, that aspect of the parties' interaction cannot be viewed in isolation, especially in light of the broad and long-standing relationship between plaintiff and Gold Kist.[19] Moreover, because this court is required by binding authority to construe any ambiguity as to the scope of the arbitration clause in favor of arbitration, the court concludes that plaintiff's claims against *Gold Kist* must be arbitrated.

Plaintiff's claims against *AgraTrade*, on the other hand, present a more difficult question. AgraTrade was not a signatory to the 1997 Membership Agreement between plaintiff and Gold Kist. The promissory note, the security agreement, and the mortgage given by plaintiff to AgraTrade did not contain arbitration clauses. The inquiry does not end there, however, as defendants offer two theories to support their contention that AgraTrade may compel plaintiff to arbitrate his claims against that entity. The first is that AgraTrade is a third-party beneficiary of the contract between plaintiff and Gold Kist, and the second is that the doctrine of equitable estoppel applies to bring plaintiff's claims against AgraTrade within the ambit of the arbitration clause at issue. The court will address these contentions in reverse order.

The Eleventh Circuit has held that where non-signatories to a contract seek to compel arbitration, the court must focus on the nature of the underlying claims asserted to determine whether the claims fall within the scope of the arbitration clause at issue. *See Sunkist Soft Drinks, Inc. v.*

---

[18]In the Eleventh Circuit, "[u]npublished opinions are not considered binding precedent," but "may be cited as persuasive authority." 11th Cir. R. 36-2. The opinion is attached as Exhibit C to Defendants' Motion to Compel Arbitration and Motion for Stay (doc. no. 2).

[19]Indeed, as the record reflects, and as the complaint alleges, plaintiff was a "member" of Gold Kist from 1990 until 1998, when the events complained of occurred. *See* Notice of Removal (doc. no. 1), Exhibit A, Complaint ¶ 8, at 3.

*Sunkist Growers, Inc.*, 10 F.3d 753, 757-58 (11th Cir. 1993); *McBro Planning & Development Corp.*

*v. Triangle Electric Construction Co., Inc.*, 741 F.2d 342, 344 (11th Cir. 1984). If the claims are

determined to be "intimately founded in and intertwined with the underlying contract obligations,"

a nonsignatory may compel arbitration. *McBro*, 741 F.2d at 344 (quoting *Hughes Masonry Co. v.*

*Greater Clark County School Building Corp.*, 659 F.2d 836, 841 n.9 (7th Cir. 1981)). Moreover,

equitable estoppel is warranted "where the signatory [to the contract containing the arbitration

clause] raises allegations of ... substantially interdependent and concerted misconduct by both the

nonsignatory and one or more of the signatories to the contract." *MS Dealer Service Corp. v.*

*Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (bracketed text in original) (quoting *Boyd,* 981 F. Supp.

at 1433).

Here, plaintiff has brought breach of contract and wrongful foreclosure claims against both

AgraTrade and Gold Kist, and claims for breach of warranty, negligence, and intentional interference

with plaintiff's contractual relations against Gold Kist. The first count of plaintiff's complaint, a

claim for breach of contract, reads as follows:

> 11.    The defendant, Gold Kist, was under a contractual obligation to supply
> chickens to its growers. Gold Kist was specifically aware that egg production and
> the growing of chickens was directly tied to the plaintiff's requirements to repay
> Agratrade Financing, Inc. Gold Kist was aware that it had a contractual obligation
> to provide growers with chickens, medicine, vaccines, health tests, supplies and
> necessary advice to growers and other suppliers in order for the plaintiff to raise
> chickens and for egg production.[20]

The second count of plaintiff's complaint, asserting a claim for wrongful foreclosure, reads, in

pertinent part, as follows:

> 17.    The defendant, AgraTrade Financing, Inc., a subsidiary of Gold Kist, Inc.[,]
> wrongfully foreclosed and/or declared the plaintiff in default pursuant to that certain

---

[20]Notice of Removal (doc. no. 1), Exhibit A (Complaint).

promissory note and mortgage dated January of 1991.

     18.    The promissory note and security agreement executed by John Lane to Agratrade Financing, Inc., was for the principal sum of $254,236.32, payable at an interest rate of 12 ½ percent over ten years. The payment schedule called for payments to be based upon 18 cents per dozen per hatched egg beginning on or about January 21, 1991. The payments were to be made over a period of ten years totaling $446,957.75. In 1999, the defendant, Gold Kist, failed to resupply the plaintiff with chickens and the defendant, AgraTrade Financing, Inc. continued to demand payment.

     19.    The defendant, Gold Kist, intentionally refused to resupply the plaintiff with chicken flock in 1999 *further damaging the plaintiff economically and to hasten alleged default of the plaintiff to AgraTrade Financing, Inc. Gold Kist knew or should have known that supplying the plaintiff with disease [sic] chickens in 1998 as well as no chickens [in] 1999, 2000 and 2001 would result in the default of plaintiff under the terms of the promissory note. Thereafter, defendant, AgraTrade Financing, Inc. declared the plaintiff in default and subsequently wrongfully foreclosed upon the plaintiff and took possession of his land and equipment even though repayment of the loan was based on an egg production schedule.*[21]

In the third count, a breach of contract claim against AgraTrade, plaintiff alleges "[t]he defendant AgraTrade Financing, Inc., has breached its contract with the plaintiff. The defendant breached its agreement by continuing to demand payment under the promissory note even though the plaintiff had no egg production in 1999 and thereafter."[22]

     It seems clear that the claims brought by plaintiff against Gold Kist and AgraTrade are significantly intertwined, as are the business entities themselves. AgraTrade is Gold Kist's wholly-owned subsidiary, and provides financing for Gold Kist members, such as plaintiff. The promissory note executed by plaintiff and AgraTrade during August of 1990 provides that the payment schedule for the principal of the loan to be repaid was 18.5 cents per dozen hatching eggs for approximately

---

[21]*Id.* (emphasis supplied).

[22]*Id.* ¶ 22.

36 weeks per year for ten years.[23]  Around the same time, plaintiff and Gold Kist signed a

Membership Agreement,[24] and plaintiff and Golden Poultry (at the time 75% owned by Gold Kist,

but later a wholly-owned division of Gold Kist) entered into an agreement during December of 1990

for the delivery of a hatching egg flock.[25]  Thus, plaintiff's payment terms were based on his separate

agreements with Golden Poultry and Gold Kist to produce hatching eggs.  According to the

complaint, when Gold Kist ceased supplying plaintiff with hatching egg flocks, plaintiff became

unable to make payments under the terms of his agreement with AgraTrade, and the collateral he had

pledged as security for loans was ultimately foreclosed.  Further, plaintiff alleges that Gold Kist and

AgraTrade acted in concert to his detriment.[26]

Accordingly, the court finds that the claims are "intimately founded in and intertwined with

the underlying contract obligations," and holds that AgraTrade may compel arbitration under the

arbitration clause contained in the 1997 Membership Agreement between plaintiff and Gold Kist.

In light of this determination, the court need not address defendants' alternate, third-party beneficiary

theory.

## C.    Unconscionability

Plaintiff also argues that the arbitration clause should not be enforced because it is

unconscionable.

> A court should "refuse to enforce an arbitration agreement where the record
> supports a determination of unconscionability." *Ex parte Napier,* 723 So.2d 49, 52
> (Ala. 1998).  The burden of proving unconscionability of an arbitration agreement

---

[23]Plaintiff's Response in Opposition to Defendants' Motion to Compel Arbitration (doc. no. 4), Exhibit 1.

[24]Defendants' Reply to Plaintiff's Response in Opposition to Defendants' Motion to Compel Arbitration and for Stay (doc. no. 6), Exhibit 2.

[25]Plaintiff's Response in Opposition to Defendants' Motion to Compel Arbitration (doc. no. 4), Exhibit 4.

[26]Notice of Removal (doc. no. 1), Exhibit A, Complaint ¶¶ 19, 31, at 6, 9.

rests on the party challenging the agreement. *See Rhode v. E & T Invs., Inc.*, 6 F.Supp.2d 1322, 1326 (M.D. Ala. 1998). Alabama courts rely on the following four factors in determining whether a contract or contract provision is unconscionable: (1) whether there is an absence of meaningful choice on one party's part; (2) whether the contractual terms are unreasonably favorable to one party; (3) whether there was unequal bargaining power among the parties; and (4) whether there were oppressive, one-sided or patently unfair terms in the contract. *Rollins, Inc. v. Foster*, 991 F.Supp. 1426, 1434 (M.D. Ala. 1998) (citations omitted). In addition, "Alabama courts recognize that the rescission of a contract or portion of a contract 'is an extraordinary remedy usually reserved for the protection of the unsophisticated and uneducated.'" *Id.* at 1434-35 (citations omitted). The question that must be asked here is "whether the arbitration clause is so unfavorable to [plaintiff] that it simply would not have been reasonable for [him] knowingly to accept it, given any meaningful choice," and whether [he] "cannot obtain through arbitration the very same relief that would be otherwise available in a court action." *Roberson v. The Money Tree of Alabama, Inc.,* 954 F.Supp. 1519, 1525-26 (M.D. Ala. 1997) (applying Alabama law).

*Young v. Jim Walter Homes, Inc.,* 110 F.Supp.2d 1344, 1347-48 (M.D. Ala. 2000). Here, plaintiff claims that: he had no meaningful choice in signing the 1997 Membership Agreement containing the arbitration clause; that Gold Kist had substantially superior bargaining power; the preclusion of punitive damages in the arbitration clause violates the public policy of Alabama; and, the costs of arbitration effectively foreclose plaintiff's ability to pursue his claims.

Plaintiff supports his argument that he had no meaningful choice to sign the Membership Agreement containing the arbitration clause only with the conclusory statement that "[t]he only way he could pay AgraTrade back was to continue to accept flocks of birds from Golden Poultry/Gold Kist."[27] This unsupported assertion, without more, is insufficient to establish that enforcement of the arbitration clause would be unconscionable.

Similarly, plaintiff's contention that the arbitration clause should not be enforced because "Gold Kist is a huge conglomerate in the agricultural business," while plaintiff was "a small family

---

[27]Plaintiff's Response in Opposition to Defendants' Motion to Compel Arbitration (doc. no. 4), at 7.

farmer who was recruited by Gold Kist when the latter expanded its operations in Alabama,"[28] is unavailing. Gold Kist is organized as a cooperative, in which plaintiff was a member, entitling him to a share and voting power.[29] Gold Kist's arbitration policy was implemented by its Board of Directors, who are themselves members of the cooperative.[30] Plaintiff has not demonstrated a lack of education or sophistication, such that the arbitration clause should not be enforced.

Plaintiff next argues that enforcement of the arbitration clause is unconscionable because it precludes punitive damages, which would otherwise be available under Alabama law in a judicial proceeding for his claims sounding in tort — *i.e.*, his claim for wrongful foreclosure against AgraTrade, and his claim for intentional interference with contractual relations against Gold Kist. Plaintiff cites *Thicklin v. Fantasy Mobile Homes, Inc.*, No. 1000224, 2002 WL 27925 (Ala. Jan. 11, 2002), in support of this argument.

In *Thicklin*, the Alabama Supreme Court addressed an issue of first impression: "Whether a provision in a contract immunizing a party from liability for punitive damages is substantively unconscionable as violating public policy in that it 'attempt[s] to alter in an impermissible manner fundamental duties otherwise imposed by the law.'" *Id.* at *6. The Court observed that "a contract provision that violates public policy can be subsumed under the theory of substantive unconscionability." *Id.* at *7. When examining the public policy of Alabama with regard to the recovery of punitive damages, the Court stated:

The public policy of this State, as articulated by the Legislature at § 6-11-20, Ala.

---

[28]*Id.* at 8.

[29]Motion to Compel Arbitration and Motion for Stay (doc. no. 2), Exhibit B, Articles of Incorporation and By-Laws, Gold Kist, Inc., Atlanta, Georgia, October 25, 1996, Article XI, section 6, at 7.

[30]*Id.*, Article II, Section 2, at 1.

Code 1975,[31] recognizes that certain circumstances — namely, gross, oppressive, or malicious fraudulent acts committed intentionally; malicious wrongful acts with an intent to injure or acts committed under circumstances to which the law will imply an evil intent; and conduct carried on with a reckless or conscious disregard of the rights or safety of others — warrant the recovery of punitive damages. The Criminal Code is replete with statutes that impose fines and imprisonment in an effort to inhibit the commission of intentional or reckless acts. We therefore have strong legislative expressions of public policy calculated to deter citizens from engaging in intentional or wanton acts that endanger others or that otherwise do harm. It should come as no surprise that this Court from time to time has held contractual provisions dealing with the consequences of conduct that might give rise to the recovery of punitive damages to violate the public policy of this State.

...

It is equally sound to conclude that it violates public policy for a party to contract away its liability for punitive damages, regardless whether the provision doing so was intended to operate in an arbitral or a judicial forum....[I]t is not within the province of parties to a predispute arbitration agreement to waive a punitive-damages award.

*Id.* at *7-*8. The Alabama Supreme Court's opinion in *Thicklin* also quoted its reasoning in

*Cavalier Manufacturing, Inc. v. Jackson*: "If parties to an arbitration agreement waive an

arbitrator's ability to award punitive damages, the door will open wide to rampant fraudulent conduct

with few, if any, legal repercussions." *Thicklin,* 2002 WL 27925, at *7 (quoting *Cavalier*

*Manufacturing, Inc. v. Jackson,* No. 1000391, 2001 WL 1177028, at *3 (Ala. Oct. 5, 2001)).

Despite these broad statements by the Alabama Supreme Court, defendants argue that the

public policy of Alabama is not implicated, and that portion of the arbitration clause at issue which

---

[31]Ala. Code § 6-11-20(a) provides:

Punitive damages may not be awarded in any civil action, except civil actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410, other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff. Nothing contained in this article is to be construed as creating any claim for punitive damages which is not now present under the law of the State of Alabama.

precludes an award of punitive damages should be enforced.  Specifically, defendants argue that, because of Gold Kist's organization as an agricultural *cooperative*, "[t]he public policy of Alabama is simply not implicated, or only tangentially implicated, where parties agree, before a dispute arises, to prohibit an award of punitive damages where such an award would be satisfied from their own collective pockets."[32]  Defendants point to the arbitration policy, which states that "[s]ince the cooperative is owned and governed by its members, any recovery against the cooperative would be at the expense of its member owners."[33]  According to *Black's Law Dictionary*, the term "cooperative," when used as a noun, usually designates "[a]n organization or enterprise (as a store) owned by those who use its services."  *Black's Law Dictionary* 336 (7th ed. 1999). Gold Kist is a corporation, and when the term "cooperative" is used as an adjective modifying, or describing, a corporate entity, the same source provides that it usually refers to "[a]n entity that has a corporate existence, but is primarily organized for the purpose of providing services and profits to its members and not for corporate profit."  *Id.* at 342.

While this argument has some appeal, the court concludes that the public policy of the State of Alabama, as declared by the Alabama Supreme Court in *Thicklin*, does not leave room for such an exception.  Both *Thicklin* and the *Cavalier Manufacturing* case concerned consumer contracts, which are scrutinized more closely by courts than commercial contracts, such as the one at issue here.   Nonetheless, the Alabama Supreme Court's conclusion in *Thicklin* and *Cavalier Manufacturing* that parties may not waive the potential recovery of punitive damages in predispute arbitration agreements does not appear to be limited solely to consumer transactions.  Accordingly,

---

[32]Defendants' Reply to Plaintiff's Response in Opposition to Defendants' Motion to Compel Arbitration and for Stay (doc. no. 6), at 19.

[33]*Id.*, Exhibit 1B, at 1.

-18-

this court finds that the portion of the arbitration clause contained in plaintiff's 1997 Membership

Agreement, proscribing any award of punitive damages, cannot be enforced. *Cf. Paladino*, 134 F.3d

at 1061-62 (arbitration clause requiring the arbitration of plaintiff's Title VII claims, but limiting the

damages that could be recovered, would not be enforced; agreement limiting damages cannot "serve

the same remedial and deterrent functions as litigation").

The next question that must be answered is whether this infirmity renders the entire

arbitration clause unenforceable, or whether the punitive damages preclusion may be severed.

> Faced with arbitration agreements proscribing statutorily available remedies, courts have either severed the illegal provision and ordered arbitration, or held the entire agreement unenforceable. *Compare Herrington v. Union Planters Bank, N.A.*, 113 F.Supp.2d 1026 (S.D. Miss. 2000) (severing an unlawful provision prohibiting award of punitive damages), *with Graham Oil Co. v. ARCO Products Co.*, 43 F.3d 1244, 1249 (9th Cir. 1994) (voiding the entire arbitration clause). Courts finding severance appropriate rely on a severance provision in the arbitration agreement, or the general federal policy in favor of enforcing arbitration agreements. *See, e.g., Etokie v. Carmax Auto Superstores*, 133 F.Supp.2d 390 (D. Md. 2000) (relying on policy favoring arbitration agreements).
>
> [T]his court has previously rejected the contention that the policy favoring arbitration agreements requires that courts sever unlawful provisions, rather than void the agreement. *See Paladino*, 134 F.3d at 1058. In *Paladino*, the arbitration agreement expressly required arbitration of the plaintiff's Title VII claims, but limited the remedies available through arbitration. *See id.* at 1061-62. This court recognized that federal statutory claims are arbitrable only when arbitration can serve the same remedial and deterrent functions as litigation, and an agreement that limits the remedies available cannot adequately serve those functions. *See id.* (citing *Gilmer*, 500 U.S. at 28, 111 S.Ct. 1647). If the arbitration agreement limits remedies Congress determined were appropriate, it should not be enforced. *See id.* (citations omitted).

*Perez v. Globe Airport Security Services, Inc.*, 253 F.3d 1280, 1286 (11th Cir. 2001).

Plaintiff's 1997 Membership Agreement does not contain a severability clause.   The

arbitration policy adopted at Gold Kist's 1993 annual meeting, which is not explicitly incorporated

-19-

into the agreement between plaintiff and Gold Kist, contains only the following statement: "to the extent that prior to or during arbitration the parties have agreed to waive or limit any remedies, such waiver or limitation shall be binding on the arbitrator unless the clear weight of authority establishes that it is unenforceable."[34]

*Perez* addressed an arbitration agreement that required the plaintiff to arbitrate any and all disputes relating to her employment. Perez brought a Title VII claim against her employer following termination of her employment. Her employment agreement with Globe Airport Security Services contained an arbitration clause, reading in part: "despite any rule providing that any one party must bear the cost of filing and/or the arbitrator's fees, all costs of the American Arbitration Association and all fees imposed by any arbitrator hearing the dispute, will be shared equally between you and the Company." *Perez*, 253 F.3d at 1282. The Eleventh Circuit concluded that this provision unlawfully limited remedies to which a prevailing party would be entitled under Title VII. When considering whether the illegal provision would be severed in the absence of a severability provision in the agreement, the Eleventh Circuit held that "[i]f the arbitration agreement limits remedies Congress determined were appropriate, it should not be enforced." *Id.* at 1286. The Eleventh Circuit further stated that "Globe's attempt to defeat the remedial purpose of Title VII taints the entire agreement, making it unenforceable." *Id.* at 1287. The Court of Appeals observed that "[t]o sever the costs and fees provision and force the employee to arbitrate a Title VII claim despite the employer's attempt to limit the remedies available would reward the employer for its actions and fail to deter similar conduct by others." *Id.*

The concerns raised by the Eleventh Circuit in *Perez* are not present here. The arbitration

---

[34]*Id.* at 3; *see also* text accompanying notes 6-8 *supra.*.

-20-

clause in this action does not implicate federal statutory rights. Thus, unlike the arbitration clause at issue in *Perez*, Gold Kist's limitation of the damages that may be recovered is not an attempt to vitiate plaintiff's rights and damages as established by Congress. Indeed, Gold Kist's stated rationale for the proscription of punitive or exemplary damages was based on its organization as a cooperative, and the limitation was intended to benefit its members by limiting the amount for which they could potentially be "liable" through reduction of shared profits. The decision to preclude punitive or exemplary damages was made by the Board of Directors, who are themselves members of the cooperative. Thus, this court concludes that, because there is no conflict here between the attempt to limit the damages that may be recovered and federal rights, and in light of the federal policy strongly favoring the enforcement of arbitration agreements, the provision proscribing punitive damages will be severed from the arbitration clause.

Plaintiff's final argument against enforcement of the arbitration clause is that the costs of arbitration are prohibitive, such that he would be deprived of a forum in which to bring his claims. The Supreme Court, in *Green Tree Financial Corp. — Alabama v. Randolph*, 531 U.S. 79, 92, 121 S.Ct. 513, 522-23, 148 L.Ed.2d 373 (2000), recognized the possibility that arbitration could be avoided on this basis, stating: "where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."

The parties agree that the arbitration would be conducted in accordance with the Commercial Arbitration Rules ("Rules") of the American Arbitration Association.[35] Plaintiff has submitted evidence that the initial filing and case service fees, based on the size of his claim, would be

---

[35]This portion of the arbitration policy is not contained in the record.

$3,750.[36]   According to the Rules, the filing fees cover American Arbitration Association administrative services, but do not include arbitrator compensation or expenses, reporting services, or any post-award charges incurred by the parties in enforcing the award.[37]  Defendants point out that the Rules provide for the American Arbitration Association to defer or reduce the administrative fees, "in the event of extreme hardship on the part of any party."[38]

Plaintiff has submitted an affidavit, stating that his net monthly family income is $2,322, and his total monthly expenses range from $2,176 to $2,400.  His wife had recently lost her job and was unemployed on the date the affidavit was made.[39]

The court concludes that while the arbitration costs have the *potential* to be steep, plaintiff's projections amount to no more than conjecture and speculation.  Additionally, plaintiff has not submitted evidence comparing those anticipated costs with the anticipated costs of litigation.  Like the plaintiff in *Randolph*, plaintiff has demonstrated only a *risk* that he "will be saddled with prohibitive costs," *Randolph*, 531 U.S. at 91, 121 S.Ct. at 522, and invalidation of the agreement on that basis is not warranted. *See Boyd v. Town of Hayneville*, 144 F.Supp.2d 1272, 1280 (M.D. Ala. 2001) (ability to pay costs should be determined on a case-by-case basis; cost projections based on American Arbitration Association Rules were speculative).

## V. CONCLUSION

For the foregoing reasons, defendants' motion to compel arbitration is due to be granted.  The provision of the arbitration clause precluding punitive damages is due to be severed, however.

---

[36]Plaintiff's Response in Opposition to Defendant's Motion to Compel Arbitration (doc. no. 4), Exhibit 6, at 25.

[37]*Id.* at 3.

[38]*Id.* at 18.

[39]*Id.*, Exhibit 7.

Moreover, the motion for stay is due to be denied.  Section 3 of the Federal Arbitration Act,

9 U.S.C. § 3, provides:

> If any suit or proceeding be brought in any of the courts of the United States upon
> any issue referable to arbitration under an agreement in writing for such arbitration,
> the court in which such suit is pending, upon being satisfied that the issue involved
> in such suit or proceeding is referable to arbitration under such an agreement, shall
> on application of one of the parties stay the trial of the action until such arbitration
> has been had in accordance with the terms of the agreement, providing the applicant
> for the stay is not in default in proceeding with such arbitration.

Courts have held, however, that this provision does not preclude dismissal of an action when all of

the issues must be submitted to arbitration.  *See Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161,

1164 (5th Cir. 1992); *Sparling v. Hoffman Construction Co., Inc.,* 864 F.2d 635, 638 (9th Cir. 1988);

*Boyd v. Homes of Legend,* 981 F. Supp. 1423, 1443 (M.D. Ala. 1997); *Sea-Land Service, Inc. v. Sea-

Land of P.R., Inc.*, 636 F. Supp. 750, 757 (D. Puerto Rico 1986).  In *Alford,* the Fifth Circuit adopted

the reasoning of the district court in *Sea-Land,* which found dismissal of the action to be justified

in such circumstances:

> [W]e do not believe the proper course is to stay the action pending arbitration.  Given
> our ruling that all issues raised in this action are arbitrable and must be submitted to
> arbitration, retaining jurisdiction and staying the action will serve no purpose.  Any
> post-arbitration remedies sought by the parties will not entail renewed consideration
> and adjudication of the merits of the controversy but would be circumscribed to a
> judicial review of the arbitrator's award in the limited manner prescribed by law.

*Alford,* 975 F.2d at 1164 (quoting *Sea-Land,* 636 F. Supp. at 757).

In *Boyd,* another district court within this Circuit found the Fifth Circuit's reasoning

persuasive, observing "[d]ismissal better serves the interests of judicial economy."  981 F. Supp. at

1443.  For the same reasons, this court agrees.  Accordingly, plaintiff's claims will be dismissed, but

without prejudice to his right to pursue them in the arbitral forum.

A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this _5th_ day of April, 2002.

United States District Judge